IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARIEL LINDSAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.   18 C 4659 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| COUNTY OF COOK, a municipal corporation; | ) | |
| THOMAS DART, Cook County Sheriff; | ) | |
| KEVIN G. CONNELLY, EDDIE AVANT, and | ) | |
| J. BANKS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ariel Lindsey, a Cook County Sheriff Deputy, has brought a three count complaint against her employer the County of Cook and Cook County Sheriff Thomas Dart, Executive Director of Court Services Kevin Connelly, and Eddie Avent, another Director within the Court Services Unit.   Count I alleges that defendants violated plaintiff's First Amendment right to free expression based on certain posts she made to her personal Facebook account.   Count II alleges that defendants deprived her of due process under the Fourteenth Amendment when they "punished" her for her posts.   Count III is a state law claim against Cook County for indemnity.  Defendants have moved for summary judgment on all counts.   Plaintiff has moved for summary judgment on Count I.   For the reasons described below, defendants' motion is granted and plaintiff's motion is denied.

## BACKGROUND

The facts of this case are largely undisputed as demonstrated by the parties L.R. 56 .1 statements.   Plaintiff has been employed by the Cook County Sheriff's Office as a deputy Sheriff

since 2004. In July 2016 plaintiff was assigned to the Criminal Courts Building located at 26th and California Streets in Chicago, Illinois. She works in the Court Services Unit. Plaintiff's job duties include maintaining order in courtrooms, escorting judges from their chambers to the bench, escorting prisoners from their jail cells to the courtroom, and carrying weapons when not in court. Since 2013 plaintiff has "floated" at the courts building, meaning she is not assigned to one particular courtroom.

From July 6, 2016, through July 8, 2016, plaintiff made several posts to her Facebook account. Those posts referenced a July 2016 shooting of police officers in Dallas, Texas, and the public sentiment towards law enforcement officers. When she made her posts, plaintiff intended to show people the negativity that was happening and that negative attitudes and hate led to things like the Dallas shooting. She posted a statement that "It's all fun and games until it's real," intending to convey her feeling that when people make statements and lighthearted comments about killing people they "speak it into existence." She also commented on a photo of the Dallas shooting, expressing her feeling that the media was helping to circulate the negativity people were communicating. In one post she asked God to watch over her brother, whom she identified as a Chicago police officer, indicating that if something happened to him she would "have to kill every muthafucka out here." She admits that at that time she felt that people were saying that "random police officers and people who don't agree with someone should be shot."

In one particularly important post she stated that "I hope I don't get killed today coming home from work. My son has practice today." Then in response to a comment on her post, plaintiff stated, "That's nice, but you really don't care. Actually no one on my friends list really cares. From the looks of things, but that's fine. I'm sure lots of people will say nice things at my

2

funeral. Raise money for my son, check on my family. But no one really will understand the magnitude until that day. Just keep typing. . ."

In another post, a commenter stated, that "you no sooner post this and 11 cops shot, 4 dead, be careful what you wish for," apparently referencing the Dallas shooting. Plaintiff responded "Exactly. I told them it was coming now everybody got their mouth open. They asked for it." Plaintiff testified that she was intending to convey the notion that when people spread negativity online actions like these actually happen in real life, and people should not be surprised.

Plaintiff also re-posted a photo of a rifle, which included the original poster's racist and threatening caption. Plaintiff's comment stated, "Aren't you glad that these guns are available to everyone. When you play God Be prepared to kill children." In response to a comment, she posted "the numbers will be high. I'm going to watch." She testified that at that time she felt that violent sentiments were rising and that random attacks against people and police were being encouraged.

On July 8, 2016, Connelly submitted a complaint register to the Office of Professional Review ("OPR") after hearing anonymous reports about plaintiff's posts. The complaint register indicated that Connelly had learned that plaintiff was posting information on Facebook that was "possibly in violation of Cook County Sheriff's Office policy."

When plaintiff reported to work on July 10, she was assigned to work in the Sheriff's Office, which typically consisted of desk work. The following day she was reassigned from the courtroom where she had most recently worked and was told by her immediate supervisor to go to OPR. The supervisor told her he did not know why. When she reported to OPR, she met with two investigators who told her she was being de-deputized, which meant that she was relieved of

3

the power to arrest and was no longer authorized to carry a firearm. She was then taken to Human Resources ("HR") where she met with a nurse and another employee. The nurse was an employee of HR who met with employees to determine whether they should be sent for a Fitness For Duty evaluation by a third-party medical examiner.

At HR plaintiff was asked how she was feeling and was told that they were concerned about some of her social media posts, particularly those about her son. She was told that she would have to go for a mental examination to determine her fitness for duty. According to plaintiff, the HR representatives told her that she would be "suspended" without pay, but that she could use her benefit time so that she could be paid while not working. She admits that this was consistent with the Collective Bargaining Agreement in force at the time, which allowed an employee to use benefit time if, in the opinion of the Sheriff's Office, an employee's health warranted an extended absence.

Plaintiff then returned to the Criminal Courts building to retrieve her gun to turn it in to OPR. She spoke with her immediate supervisor, James Banks, who told her they would "get to the bottom of this."

On July 23, 2016, plaintiff attended a fitness for duty exam with a psychiatrist. According to the records for that exam, plaintiff was referred for the exam as a result of "some Facebook postings she made about being killed on the way home, and remarks pertained [sic] to her funeral, taking care of her son and no-one cares about her. So it was due to her erratic comments and recent erratic behavior at the job, so a safety concern." The report found that plaintiff was fit for immediate duty, with no restrictions.

4

The Sheriff's Office contacted plaintiff the next day and told her she had been approved for work, and they were waiting for the approval in writing. The nurse called plaintiff the following day and told plaintiff that she was authorized to return to work on August 3, 2016. When she returned to work she was assigned to the Daly Center. She remained de-deputized. She grieved her de-deputization, had a hearing on December 5, 2016, and was re-deputized thereafter.

As a result of the investigation, OPR issued a memo finding that plaintiff's posts violated the Sheriff's Policy on Employee Speech Expression and Social Networking (the "Social Networking Policy"), and recommended a five day suspension. That discipline was imposed through command channel review, with Connelly initiating "summary punishment." Connelly had authority to recommend a modification but could not change it on his own. He did not recommend a change. Avent also signed off on the summary punishment request, but recommended that plaintiff be allowed to use her benefit time to avoid loss of pay. That recommendation was followed.

Plaintiff grieved the suspension, had another arbitration hearing, and the suspension was reduced to a written warning. She never served any suspension.

## **DISCUSSION**

Defendants have moved for summary judgment on all claims. Plaintiff has moved for summary judgment on her First Amendment claim (Count I). Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of

5

establishing that there is no genuine dispute as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. See CTL ex rel. Trebatosky v. Ashland Sch. Dist., 743 F.3d 524, 528 (7th Cir. 2014). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported only by speculation or conjecture.'" Grant v. Trus. of Ind. Univ., 870 F.3d 562, 568 (7th Cir. 2017).

Count I alleges that defendants retaliated against plaintiff in violation of her First Amendment right to free speech or expression. To establish a First Amendment retaliation claim, a public employee like plaintiff must demonstrate that: 1) her speech was constitutionally protected; 2) she suffered a deprivation likely to deter free speech; and 3) her speech was at least a motivating factor in the employer's actions. Kidwell v. Eisenhauer, 679 F.3d 957, 964 (7th Cir. 2012). For purposes of summary judgment analysis, to establish a prima facie case of retaliation, plaintiff must submit evidence that her speech (in the instant case her Facebook posts) was at least a motivating factor in the defendants' decision to take retaliatory action against her. Id. at 965. The burden then shifts to defendants to rebut the causal inference raised by plaintiff's evidence. If defendants fail to counter plaintiff's evidence, then plaintiff has established the causation necessary to succeed on her claim. Id. Whether a public employee's speech is protected by the First Amendment is a question of law for the court to decide. Gustafson v. Jones 290 F.3d 895, 906 (7th Cir. 2002).

In the instant case, the parties' dispute centers on the first step--whether plaintiff's posts were constitutionally protected. To determine this step, courts look to the Connick-Pickering

test—"whether the employee spoke as a citizen on a matter of public concern, and if so, her interest as a citizen in commenting on the matter of public concern outweighed the State's interest in promoting the effective and efficient public service." Houskins v. Sheahan, 549 F.3d 480, 490 (7th Cir. 2008). The first step is to determine whether plaintiff was speaking as a private citizen or as part of her public job, before asking whether the subject matter of the particular speech is a topic of public concern. Id. In this regard, plaintiff presents a facial challenge to the Sheriff's Social Networking Policy as being "overbroad." That portion of the policy provides :

> C.   Unauthorized Endorsements and Advertisements
>
> 1.   While employees are not restricted from engaging in the following activities as private citizens or as authorized members of a recognized bargaining unit or officer association, employees may not represent the CCSO or identify themselves in any way that could be reasonably perceived as representing the CCSO in order to do any of the following, unless specifically authorized by the Department head/designee:
>
>> a.   Endorse, support, oppose or contradict any political campaign or initiative.
>>
>> b.   Endorse, support, oppose or contradict any social issue, cause or religion.
>>
>> c.   Endorse, support or oppose any product, service, company or other commercial entity.
>>
>> d.   Appear in any commercial, social or nonprofit publication or any motion picture, film, video, public broadcast or on any web site.
>
> 2.   Additionally, when it can reasonably be construed that an employee, acting in his/her individual capacity or through an outside group or organization (e.g., bargaining group), is affiliated with the CCSO, the employee shall give a specific disclaiming statement that any such speech or expression is not representative of the CCSO.

Plaintiff takes umbrage with the language that provides that employees may not represent the CCSO or identify themselves in any way that could be reasonably perceived as representing the

CCSO when speaking on issues. Relying on the Supreme Court's opinion in Garcetti v. Ceballos, 547 U.S. 410 (2006), plaintiff argues that "courts allow substantial restriction of speech only for employees who speak pursuant to their official duties." Because the policy goes beyond this and restricts speech of employees who may be perceived as speaking for the Sheriff, plaintiff argues the policy is overbroad.

The court disagrees with plaintiff's position. She reads Garcetti far too broadly. Garcetti involved a deputy district attorney who was disciplined for an official memorandum that he wrote and distributed as part of his job duties. The Court specifically held "that when public employees make statements pursuant to their official duties the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421. Contrary to plaintiff's position, the Court did not hold that restriction is allowed "only" when the employee speaks as part of his or her official duties. Rather, the Court held only that when he or she does, such speech can be restricted. Garcetti simply did not create a bright line category of speech that can be restricted as plaintiff suggests, and for good reason. If a public employee were to hold herself out to be speaking for her employer without authority to do so as part of her job duties, under plaintiff's view of the law her speech could not be restricted. This cannot be and is not the law. Even if an employee spoke as a private citizen on a matter of public concern, under Connick-Pickering, her interest in commenting on the matter must be weighed against the employer's interest in promoting effective and efficient public service. See Moretto v. Tazewell County Sheriff's Office, 2019 WL 690546 at *3 (C.D. Ill. Feb. 19, 2019). Consequently, the court rejects plaintiff's argument that the Social Networking Policy is overbroad on its face.

8

Plaintiff also challenges the policy as it was applied to her. As noted, the court's first task is to determine if her speech was constitutionally protected, which means determining whether she was speaking as a private citizen on a matter of public concern. Even under a broad reading of the policy, plaintiff was speaking as a private citizen. She does not identify herself as a Deputy Sheriff, and nothing in her posts suggests or in any way could reasonably be perceived that she was representing the Sheriff's Office.

Defendants argue that even if plaintiff spoke as a private citizen, her posts are not protected because she spoke only about her own personal interest. According to defendants, even speech that is of interest to the public is not protected "if it addresses only the personal effect upon the employee." Smith v. Fruin, 28 F.3d 646, 653 (7th Cir. 1994). Courts look to the "content, form, and context" of the statement to determine if it rises to the level of public concern. Kristofek v. Village of Orland Hills, 712 F.3d 979, 984 (7th Cir. 2103) (quoting Connick v. Myers, 461 U.S. 138, 147-48 (1983)). Content is the most important factor. Chaklos v. Stevens, 560 F.3d 705, 714 (7th Cir. 2009). The speaker's motive is considered as part of the "context" in which the speech was made, but the Seventh Circuit has emphasized "that speech of public importance is only transformed into a matter of private concern when it is motivated solely by the speaker's personal interests." Id. (emphasis in original). It is the objective of the speech that counts, as determined by the content, form and context. If the objective is "simply to further a purely personalized grievance, then the speech does not involve a matter of public concern." Moretto, 2019 WL 690546 at * 3. "But, if an objective of the speech was also to bring about change with public ramifications extending beyond the personal, then the speech does involve a matter of public concern." Id. (citing Kristofek, 712 F.3d at 986).

9

In the instant case, although close, the court concludes that plaintiff was speaking on a matter of public concern. It is true, as defendants argue, that plaintiff was expressing her personal viewpoint on current issues, but the object of the speech was not only to further her private interests, but to suggest that people's views about law enforcement need to change.

Because the court concludes that plaintiff was speaking as a private citizen on a matter of public concern, the court must proceed to the second part of the Connick-Pickering test, and balance plaintiff's interest as a citizen commenting on the matter against the Sheriff's interest in promoting effective and efficient public service. Moretto, 2019 WL 690546 at *3 (citing Spiegla v. Hull, 481 F.3d 961, 965 (7th Cir. 2007)). This portion of the test "is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." Craig v. Rich Twp. High Sch. Dist. 227, 736 F.3d 1110, 1118 (7th Cir. 2013). It is the employer's burden to demonstrate that its interest as an employer outweighs the employee's interest in speaking out on a matter of public concern. Gustafson, 290 F.3d at 909. To evaluate the employer's interest, the court must "focus on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." Craig, 736 F.3d at 1119 (quoting Rankin v. McPherson, 483 US 378, 388 (1987)). The potential disruption need not actually occur for the employer to act, and the court must "give substantial weight to government employers' reasonable predictions of disruption." Id. But, the employer's assessment of possible interference must be reasonable, supported by an evidentiary foundation, and more than mere speculation. Id.

10

The degree of potential disruption needed to justify the restriction varies. "The stronger the employee's interest in speaking, the more substantial a showing the [employer] must make to justify its restriction of that speech." Gustafson, 290 F.3d at 909. "Conversely, 'the less serious, portentous, political, significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression.'" Craig, 736 F.3d at 1119 (quoting Eberhardt v. O'Malley, 17 F.3d 1023, 1026 (7th Cir. 1994)). The court must also consider the nature of the employee's job. An employer has more leeway in restricting the speech of an employee whose position requires contact with the public. Id. The time, manner, and place of the employee's speech is also relevant. Id.

In the instant case, the court concludes that defendants have carried their burden of demonstrating that their interests in remedying any potential disruption caused by plaintiff's posts outweighs plaintiff's speech interest. Although her speech transpired on her own time, it was, as previously indicated, more substantially a statement of her personal views or grievances than involving matters of public concern, and thus not the sort of topic that defendants would require a compelling reason to restrict. As a Deputy Sheriff her job required contact with the public and carrying a firearm. The record reveals that at least one of her co-workers saw her posts and was concerned enough to report it to her superiors. At least one post can be read as indicating she has the potential to become violent. Defendants also thought her posts might indicate that she had suicidal ideations. Although the court does not necessarily agree with defendants' interpretation of the posts, it cannot conclude that defendants' interpretation is unreasonable. Defendants had reasonable grounds to believe that plaintiff's post may cause concern among her co-workers, possibly causing some to mistrust plaintiff. As a result, the court concludes that plaintiff's speech

11

was not protected. Consequently, defendants' motion for summary judgment on Count I is granted and plaintiff's motion is denied.[1]

In Count II plaintiff alleges that she was denied her Fourteenth Amendment due process rights. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." Thus, to establish her claim plaintiff must provide evidence that demonstrate that she has a property right in her job. Cleveland Bd. of Educ. v. Laudermill, 470 U.S. 532, 538 (1985). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from and independent source such as state law. Board of Regents v. Roth, 408 U. S. 564, 577 (1972). A property right can be created by statute, ordinance, or contract. Bishop v. Wood, 426 U.S. 341, 344-45 (1976).

Defendant argues that plaintiff has not shown that she has a property interest in her job, and even if she does, that her interest was denied in any significant manner. Plaintiff's only response is to suggest that the issue of whether she has a property right to continued employment should be decided by a jury. To the contrary, the issue of the existence of a property right is a question of law to be decided by the court, not a question of fact to be decided by a jury. Malcak v. Westchester Park Dist., 754 F.2d 239, 243 (1985). Plaintiff has presented no evidence that she has a right to continued employment created either by statute, ordinance or by her collective bargaining agreement. Consequently, defendants' motion for summary judgment is granted as to Count II. Because Count III (indemnity) is dependent on establishing a violation in Count I or II, summary judgment is granted as to that count as well.

## CONCLUSION

---

[1] Although not necessary for the court's decision, the court agrees with defendants that even if plaintiff's speech was constitutionally protected, the individual defendants would be entitled to qualified immunity.

For the reasons described above, Defendants' motion for summary judgment [Doc. 69] is granted. Plaintiff's motion for summary judgment [Doc. 73] is denied.

**ENTER:** **November 5, 2020**

Robert W. Gettleman
**Robert W. Gettleman**
**United States District Judge**